Your Honor, may I ask how much time I have and can I reserve 10 minutes for rebuttal? I'd ask for 30, I see 20 on the clock. Yeah, so for this case, each side has 20 minutes and so you can carve it up however you wish. Now again, it's a little complicated because of all the different appeals and cross appeals and so forth. So you can really carve it up as you wish. If you want to do 10 and 10, 15 and 5, 12 and 8. I think 10 and 10. I think there's been extensive briefing here, so I'll just go 10 and 10. 10 and 10, fair enough. And then, you know, I should have asked you this at the outset, Mr. Markham, because it is, you actually can, in a sense, can go serve rebuttal in this case because we have all the different cross appeals. Before your colleague here begins, what would you like to do? Would you like to do, have time for a serve rebuttal? Yes, Your Honor. If I could have 15 for my opening and then 5 for rebuttal. We can do that. Great. Okay, so what we'll do then, and Ms. Manning here, we'll keep track of the time. There, you see it on the clock there. So we're going to go 10, 15, 10, 5. Okay. All right, counsel for Mr. Adler, you may proceed. Thank you, Your Honors. May it please the Court, I am Saeed Kashani. I represent the initial appellants in this case, which are Paul Edelot, both in his individual and derivative capacity on behalf of the Corporation PharmaPAC, and also the individual appellant, Olivia Karpinski. First, an apology that I'm sitting. I couldn't get the equipment to work properly when I was standing. The sound wasn't good, so I apologize for that. And second, thanks to the Court for hearing this case, which is essentially a state-law case. Mr. Cahill originally appended a number of federal claims, a RICO claim, claiming drug trafficking, etc. He dismissed all of that just before the case went to the jury, but the lower court, Judge Guildford, was kind enough to retain jurisdiction. So we're here before you on essentially a state-law case, and I very much appreciate the Court's taking its time even for an oral argument on essentially a state-law case. Going to the state-law issues, the number one issue for us is the Court, I won't say declined, I would say did not impose the constructive trust remedy for the assets of the Corporation. The jury found, based on the jury instructions, that Mr. Cahill transferred the assets of his Corporation, Pharmacat, PAC, to his other Corporation, Lifetech Global. And the jury found no authorization for that, found it was a breach of fiduciary duty, and awarded the shareholder, Mr. Edelot, $250,000 in damages. Which is not a coincidence, that was more or less his dollar investment in the Corporation. The pretrial order specifically provides, and I'll give the citation, at volume two of the records at page 260, specifically provides that the Court would decide after the trial, whether or not to impose the constructive trust of ordering Lifetech to return the assets. And we have cited authority, particularly the Crane case, that that remedy is available in addition to the individual damages. We think that was merely an oversight by the Court, he did not mention it in his post-trial order. And we would just like this Court to basically correct the oversight, and direct consideration of that constructive trust remedy. Because there's no doubt here what happened. I'm sorry. Was Mr. Edelot injured in his personal capacity, by his dollar investment of $250,000? Was he injured in a derivative role, or both? And if both, how can it be both? Well, the Supreme Court of California, in the Ottmanson case, has held that it can be both. And Crane also, in a case that is factually identical to the Instant case, held that there is both an individual remedy, and a derivative remedy. In the Crane case, exactly as in the Instant case, the controlling party of the corporation transferred the assets of the corporation to his own asset, basically intellectual property, to his own corporation, in return for a note. So he got, on his corporation, all the assets of the original corporation. The shareholders, they were referred to as promotional shareholders, were left with just a worthless promissory note. And the Court held that these circumstances, and I've discussed it extensively in the third brief, especially, starting at page 41 through 48 of our third brief, how, under those circumstances, there's both a derivative and an individual claim. And both lie. And again, the citation is Crane v. Electronic Memories, 50 Cal App III, 509. And that's based on Jones v. Ottmanson, 1 Cal III, 93. Under the facts here, can you tell me, briefly, what specifically was Mr. Edelot's personal injury? And then what specifically was the injury to Pharmapact? Mr. Edelot's personal injury was he invested $250,000 in Pharmapact, a corporation which had certain assets, including intellectual property. Mr. Cahill transferred all of those assets out of Pharmapact into Cahill's own corporation, Lifetech. And the jury specifically found that was a breach of fiduciary duty. By so doing, Mr. Edelot's investment was rendered valueless. It became worth zero because before he had a percentage of something, now he has a percentage of nothing. So his value went to zero. The jury specifically found that loss of $250,000. The corporate loss is that the corporation lost all of its assets. And remember, there are other minority shareholders here. Mr. Edelot was not the only one. There was other minority shareholders who were not plaintiff, but were likewise damaged in the sense that their investment also became zero. One, in fact, testified that Mr. Amir Asbardi had invested $500,000 in Pharmapact, and he also was left with nothing. So what we're asking is if Pharmapact then prevails on its construct, if there's a constructive trust in favor of Pharmapact, and if Mr. Edelot is awarded $250,000, why isn't that a double recovery for Mr. Edelot? Well, the case law simply holds that that is not, and both can lie. Both remedies lie. But let's remember that Mr. Edelot incurred a lot of expense in bringing this case and getting the assets back. I mean, that's a loss as well. If you're asking me should the court on remand consider whether there should be some rateable change as to Mr. Edelot because he's been compensated, that is something to consider. But let us consider something else. According to the defendant, according to Mr. Cahill's own private placement memorandum for his corporation, Lifetech, these assets were worth $20 million. That's what he claimed to his investors, the assets, the technology that he took. $250,000 is not a substantial percentage of $20 million. The correct result is those assets should be returned, and then we'll see what the value is, and the court can craft a remedy. The Crane case specifically says the court can craft an equitable remedy to meet the circumstances. And if the court concludes on remand that some adjustment needs to be made, the court can make that adjustment. My problem is— Is it a constructive trust remedy? Is that a mandatory remedy? I mean, it's an equitable remedy. Doesn't the court have discretion to award it or not, and we would review it for abuse of discretion here? Your Honor is correct. It is up to the court's discretion. However, here we do not see any exercise of discretion one way or another. The court's ruling did not even mention the constructive trust remedy. So we think—I believe it was just an oversight, and the remand is not to direct the court to impose the constructive trust, but to direct the court to consider the constructive trust and decide whether it is appropriate. That, we believe, is the remedy here, and that's what's stated in Crane. We're not asking this court to order a constructive trust. We're asking the court to remand to consider the constructive trust and see if it is available. Now, moving second to what I think is an interesting aspect of this, the public figure issue, I would only cite here the testimony of Mr. Cahill's partner, Mr. Cullen, who is reading from the private placement memorandum where they describe Mr. Cahill. And it says, quote, Mr. Cahill has served as a trustee and executive council member at the University of California at Irvine for the last 13 years. That's at 1049 of their excerpts. Then, at 1621 of the excerpts, Mr. Cahill himself, in response to questioning, he has asked, Are you a trustee of anything? And Mr. Cahill says, Yes, I am. Two universities. So, when it suits him, Mr. Cahill is a full-on trustee, executive council member of the University of California. But, when it comes to public figure, suddenly he's a private person and the public figure instruction doesn't apply. We say this testimony speaks for itself. It makes him a public figure. We were entitled to that instruction with respect to the alleged defamatory statements. So, that, I think, is the public figure issue. Is he a trustee to the university itself or a private foundation that is associated with the university? According to his own private placement memorandum, which is quoted on questioning by his own counsel, quoted by his partner, Mr. Cullen, he is, quote, Mr. Cahill has served as a trustee and executive council member at the University of California at Irvine for the last 13 years. That is in the record at volume 6, 1049, lines 19 to 21. And, again, this is questioned by his own counsel, the plaintiff's own counsel, where this is stated. And, again, I make the point, when it suits him, when he's raising money from investors, he is a full-on trustee, executive council member of the University of California. When he's trying to avoid liability, he's just a private person. And, incidentally, we saw the same behavior on the bank loan that he made. He's telling the jury this company is worthless. He's telling the bank to get a loan that the company is worth $16 million. He's telling his partners, I will take no salary. He's telling the bank, I'm drawing $600,000 salary, which he never drew. So, again, we see this behavior from Mr. Cahill. He comes in with recall claims. He dismisses them just before the jury doesn't present evidence, and now we end up here. Now, I'd like to reserve some time, so I'd like to go to the attorney fee issue for Ms. Karpinski. The jury awarded her damages. Because of the lack of a special verdict, which is unfortunate, was requested but not given here, we don't know for certain whether Ms. Karpinski was awarded damages on one of several possible statutes that allow attorney fees. However, the remedy is provided by the Latkin case. That's Latkins versus Watkins Associated, 6 Cal 4, 644 at 657, where it is stated where there is uncertainty as to whether the verdict covers a statutory claim with fees, then the correct remedy is a remand for the court to consider what portion of the verdict could be attributable to the statutory remedy. Mr. Khashoggi, how much did Ms. Karpinski ask the jury for, for her FEHA damages? Well, it was more than $10,000, if that's your question. It is my question. I know it's more than 10. I want to know how much more than 10, if you know. It was considerably more. I don't remember the number, but it was considerably more. It was based on a loss of, part of it was based on a loss of income. I'm sorry, I don't remember the number, but I can... Will I find it in the record? I can look for it while my counsel is, my colleague is speaking. In fact, Mr. Khashoggi, let me just jump in here. Do you want to reserve the rest of your time? Yes, unless there are questions. Okay. Any questions from Judge Lee, Judge Simon? Doesn't look like it. Okay. Great. Mr. Markham, I have you down for 15. Oops. You got to unmute there. I'll wait a second. All right. Good afternoon, Your Honors. Thank you for hearing us. Because he made the point in his brief as well, although more pejoratively, we did drop the federal claims and left only a state claim of fraud. And that was because the judge below limited us really at the last minute, just before the trial, to a time certain, which was initially five days and then it went to six. We couldn't possibly trial all the cases. We made the judgment that the fraud claim in state court was the simpler between that and the fraud claim in RICO and the fraud claim in securities. It would take less time to take to the jury and explain to the jury. We were very, very tight on time, so we dropped it. There's nothing nefarious in that. I wish we could have brought it. Because we prevailed on the fraud claim in state court. Now, what I'd like to do, if I could, is to start by talking about the pharma pack to the LifeTech Global transfer. Because that transfer is what undergirds our major assignment of error, which is the breach of fiduciary duty alleged by that transfer. And we say that was by an instruction that doesn't follow California law. It also undergirds Mr. Cresciani's constructive trust claim, and it is the basis for his derivative claim. First of all, the record is clear that Mr. Cahill did not transfer the few remaining assets of PharmaPak to his other corporation, which is LifeTech. Cahill did not own LifeTech. Another shareholder owned LifeTech, which made him an interested party, but it was not a transfer between two companies owned by Cahill. That's just not correct. What happened was this corporation, PharmaPak, two years before LifeTech was formed, or a year before, yeah, two years, was induced by Edelott's assurances that he had lots of worldwide contacts in another corporation, that he was a brilliant purveyor of FDA products with great experience. He didn't tell anybody that he'd been joined by the FDA. That he was very wealthy and owned property all over the place. He didn't tell people that he was actually bankrupt at that time, and he'd been bankrupt twice before, seven years apart, that there were no contracts, that there was no more investment, and when it started, it looked very gloomy. Then, by March of 2016, it was over. No contracts for patch-based products were found. There was no investment money left. The partners were feuding with each other, the shareholders. There was nothing left but debt, and it turns out that the patents that Mr. Edelott had said he had, which was going to be the basis for all of this money, didn't exist, as was testified to on refuted trials we point out in our brief. The patents were defunct. They hadn't been pursued. In March of 2016, some of the shareholders of Pharmapack decided to take the owner of LifeTech Global, which was Cullen, not Cagle, upon his offer to buy the one basic asset they had left, which was a patch machine that they had purchased for $85,000, and it didn't work. They transferred that to him along with the defunct patents, and that is the basis of the breach of fiduciary duty. That is the basis of the constructive trust, supposedly against LifeTech. They sink the constructive trust against LifeTech, even though the jury and the judge both think that LifeTech had done nothing wrong and they found it not liable. How you can be a constructive trustee if the jury and the judge both find you not liable is something that is not left explained in Mr. Cushani's briefs. Now, our major assignment of error is that the transfer from Pharmapack to LifeTech was done and it was a fair and reasonable transfer for all the reasons we cite in our brief. The lack of any assets, the lack of any investment capital, the investors' refusal to invest more, it all went away. So they sold the patch machine to LifeTech for $100,000, and they took that $100,000, which isn't a record in our brief, and put it to Pharmapack Dex. Now, what the judge did when he went to instruct the jury on whether they should consider that transfer from Pharmapack to LifeTech a breach of Pharmapack's duty, it said, and I'm quoting, if the directors and officers of Pharmapack or a majority of shareholders didn't have proper authority to transfer the assets, it was a breach. Now, there was not a majority of disinterested shareholders, but there were shareholders who did it. What the judge did in saying that at the end of his instruction was he plainly said that unless you have a majority of shareholders, that it is a breach of fiduciary duty. Yet, the law in California is quite different, and we cite it in our brief, and it is California Corporation Code Section 310, and it points out that if disinterested shareholders don't vote by majority and if there are other things that are wrong with the transfer, it is still not a breach of fiduciary duty if, and I'm quoting, as to contracts for transactions not approved of, as provided in paragraphs one or two above that I just summarized, the person asserting the validity of the contract or transaction sustains the burden of proving that contract or transaction was just and reasonable as to the corporation at the time it was authorized, then it's not a breach of fiduciary duty. And isn't that exactly what Judge Guilford instructed the jury in 45 when he gave them those three different alternatives separated by the disjunction or, and the third one is or, if the transaction was just and reasonable as to the corporation at the time it occurred. So he gave the jury that option. No, Your Honor, he didn't because what he said after he said number three was he said specifically, and it's following section three, it says if the directors and officers of PharmaPAC or a majority of shareholders didn't have proper authority, then the transfer of the assets was a breach. So what he said is he took it back, and if you take a look at how clear that was to Mr. Pashani, here's what he says in his closing argument. He quotes me, he says, my colleague, referring to me because I've given the closing argument for the plaintiffs. My colleague suggested that if the transfer is reasonable, they do not need the majority approval. Incorrect, he argues. He says incorrect. Mr. Markham? It's right here, black and white, referring to the instruction. But Mr. Markham? While now yellow. They must have approval of a majority of shareholders. Mr. Markham, real quick. Judge Simon has a question for you. If you look at what precedes that list of three, Judge Guilford says there are three different ways in which a transfer can be authorized, three different alternative ways. The third one is it being just and reasonable. So then when he, at the end, says if it's not authorized, then you've got a breach of fiduciary duty, but he just told them three different ways in which it can be authorized. Three different alternatives. Why isn't that enough? Well, Your Honor, I respectfully submit that when he finishes that, by saying right afterward, he says if the directors and officers of a majority of shareholders didn't have proper authority, then majority, then it's no good. So you're saying that's really the third one. All right. You're saying they've taken away the third option. Your Honor, that was so clear to Mr. Khashoggi that I just quoted to you what he said. He said, no, if they don't have a majority, they're dead. And I want to quote another thing that he said in his instruction, and this is in my brief. He said, if there's no corporate authorization, meaning no majority vote, it is a breach of fiduciary duty, period. End of, end of. Very simple. All on one page. No corporate authorization, meaning no majority vote, breach of fiduciary duty, meaning Mr. Cahill and his partners have to pay. That is quoting off of what the judge said when he took back number three. And it's just not fair to have done it that way. Now, clearly, the case law that we cited in our brief supports that, supports that if it's fair and reasonable, it is not a breach of fiduciary duty. And there was no evidence that it wasn't fair and reasonable. There was a lot of evidence that it was fair and reasonable. Now, I will tell you that I believe that if the court were to reverse that judgment on that claim because of that instruction, that moves the derivative of our second assignment of error, which is for the derivative, that it should have been a derivative claim going to pharmacopathy. I can't tell you how many times, however, if the court were to consider that, and I hope it doesn't because that reverses the instruction so that goes away. But if it does consider that, Your Honor, every place in this trial where they referred to this transaction and the claim, Mr. Kashani and his group found that it was a derivative claim. He says so in his pretrial statement, which I cited in our brief. In his jury instruction adopted by the court, the same jury instruction that I am quarreling with over the take back of a fair and reasonable option, he says, he quotes, If officers or majority shareholders didn't have the proper authorization to transfer its assets, it was a breach of their fiduciary duty to pharmacopathy. It doesn't say to Edelot. All right, that's at 1 ER 35 and 36, jury instruction number 45. After trial, Mr. Kashani, on behalf of Edelot, again, continued to explain his claim as derivative. He says, and he files a motion for constructive trust, and in that motion for constructive trust, he labels it motion by Paul Edelot, ex-rail pharmacopath, in for imposition of remedy of constructive trust, it's Edelot ex-rail pharmacopath. That is a derivative action. That's how they treated it. That's how it was treated all the way through. Now, in his second brief, I guess his third brief, because ours is the second, Mr. Kashani argued that we waived that because we didn't object to the instruction. You bet. During the instruction, they referred to it as a derivative claim, a claim of breach of fiduciary duty against pharmacopath, derivatively. They say derivatively. How could we object? The only time that it was determined that this was not going to be treated as a derivative claim was when we sent in our proposed judgment, and the court took out of it the derivative nature of the claim. The court scribbled it out. So instead of reading on page two of that instruction, instead of reading of that judgment, instead of reading a breach of fiduciary duty, $250,000 owed to pharmacopath, it took it out and put in Edelot. So that was the only time that it was treated as a non-derivative claim. It's very difficult to object to that. The judge has ruled in the judgment. The jury has long gone home. So I respectfully submit. Now, in the brief amount of time I have before I have to stop to save my five minutes, I want to just discuss this constructive trust idea. It is elemental, and we all know that constructive trusts are imposed on property being held by wrongdoers, typically fraudsters. So you cheat somebody out of something, you still hold the asset, it grows money, you owe that growth as well as the money back to the beneficiary. Now, in this case, there were three claims filed against EFT Global Holdings. Claims four, five, and six. And they were an unfair competition under California Code 17-200, asking for accounting and something akin to an account. On all three of those, they went to the jury. In the verdict, the jury found at page six of docket number 324, which was the jury's verdict, is Paul Edelhoff entitled to judgments against LifeCheck Global? Answer, no. In the judgment, which the court entered after the verdict, based on the verdict, the court said that there was no liability entered against EFT Global Holdings, period. Last, and later in describing to the parties what happened and what they would do during the punitive damage claim, the judge made a judicial finding. I'm going to dip a little bit into my five, but I know it's coming out of me, Your Honor, it's not you. That's all right. In the chamber's order that he issued after the jury trial on the liability part, and this is docket 330, and it's the first page of that, the judge made a finding about the unfair competition claim, which Edelhoff had asserted against the various defendants, including LifeCheck Global. That is a judge-tried case. That's a judge-tried issue in California, not a jury issue. And he says, defendants asserted counterclaims under California unfair competition claim, which are equitable in nature. The court now finds and concludes, inequitably, that the facts and law do not sufficiently establish a UCL unfair competition claim against defendants, and there's no relief. So, all over the place, there's a finding that there's no wrongdoing against EFT Global Holdings, even if there was a claim of breach of fiduciary duty against Pharmapact. That's the transferor. The transferee doesn't get dinged with that unless there's a showing of wrongdoing. And if anything is law in this case, it's that nobody found wrongdoing against LifeCheck Global. I'll reserve, except I will just say that the amount that Karpinski asked for in her punitive damage case was $2 million. She got zero, not a dime. Thank you, Your Honor. She got $10,000. She got $10,000, I thought. She got $10,000. I'm sorry. No, no, that was in liability. I apologize. The punitive damage claim, she argued for $2 million, and you're right. How much did she ask for in actuals? All right, well, I'll ask Mr. Khashoggi if he's found it. It was a lot, and I'll try to find it as well. Thank you. Very good. All right, Mr. Khashoggi, you have a little over eight minutes, I think. There we go. And, Mr. Markham, if you could mute on your side. If you could mute your microphone while Mr. Khashoggi goes. No problem. All right, Mr. Khashoggi, once you unmute, you are ready to go. Thank you, Your Honor. I'm sorry, I'm listening to my colleague. I hear some inconsistencies here. I mean, he insists that they prevailed on a fraud claim. This was a general verdict where they mixed their fraud claim and defamation. It's not possible to determine on what claim they prevailed on. That was one of the problems with the special verdict. They claimed that Bruce Cahill, my colleague just said Bruce Cahill had no ownership in LifeTech Global. If we look at Volume 10 of the record at 2337, this is the LifeTech Global private placement memorandum. Under the heading capitalization and ownership, it lists Bruce Cahill 50%. And in their so-called corporate authorization, Mr. Cahill was the one who was authorized to transfer the assets. Regarding what assets were transferred, I've discussed extensively in the briefs. There were four provisional patents that were transferred. Then LifeTech took those provisionals and used them as a basis for formal patent application. So in that sense, the provisional survived in the final patent application, which even their patent lawyer conceded was the case. Now in terms of LifeTech not being liable, if we look at the pretrial order at Volume 2260, it is stated that this is both a shareholder and derivative claim. And that the derivative constructive trust aspect is to be decided by the court after trial. Now this notion that the jury did not award damages to Mr. Etalot from LifeTech Global is consistent with the case law. LifeTech Global has no fiduciary duty to the shareholder. So the shareholder is not necessarily entitled to money damages from LifeTech. However, and this is the Sororzo case, which is on all fours. Sororzo versus Parkwater, 86 Calat 2nd, 653. In that case, there was a shareholder vote. There was a decision to transfer the assets to an innocent company, considerably innocent transferee. Nonetheless, it was found there was not shareholder approval because some shareholders didn't get noticed. In that case, the assets were ordered to be returned to the first corporation, even though the transferee was entirely innocent because there lacked corporate authorization. Now, looking to corporate authorization, here again, I think there needs to be some correction here. The relevant case, the relevant authority here is Section 310 of the Corporation's Code. And in this case, I quote from a case called Sammis, S-A-M-M-I-S, which is 48 Calat 4th at 1943, wherein it is stated, quote, Section 310 applies to contracts or transactions not approved as provided in paragraph 1 or 2 of this subdivision. In other words, Section 310 addresses the situation where the approval was based on a vote by the interested director. In other words, as the case law shows, this talk of fairness comes into play when there is majority approval, but it turns out that some of the majority are interested directors. In that case, they have to defend on the basis of fairness. But you don't get to fairness under the code unless there is first majority approval. And that's stated not only in 310, but also 1001 of the Corporate Code, which states a sale of substantially all assets requires corporate approval, requires majority approval, which was not obtained in this case. In fact, it was conceded that it wasn't obtained in this case. If we look at the jury instruction, at jury instruction 45, the famous instruction, right at the top it is stated, quote, In this case, there was a transfer of substantially all of the corporate assets of PharmaPact to Life Tech Global LLC. They never objected to that part of the jury instruction. So the jury was told right up front that there was a transfer of all assets, no objection from Mr. Cahill's side. Mr. Cahill only objected to the last two sentences of that jury instruction. Second, if we look at instruction number 4243, all of these are on behalf of the shareholder. They say the shareholder, Edelhock, claims he was damaged. That is what the jury was told to decide. Was the shareholder damaged? Answer, yes, to the tune of $250,000. No surprise, that was his investment. So he gets an investment back. But the constructive trust remedy remains for the court to impose. And again, this is in pretrial order. And incidentally, there was no objection from the other side as to that portion of the pretrial order. So again, I'm not going to go on. Can you tell me, I think you mentioned that a trial claim PharmaPact's assets were worth around $20 million. What's the basis for that valuation? Their own private placement memorandum placed a valuation of $20 million. Mr. Cahill prepared a private placement memorandum for Lifetech Global soon after the transfer. It was a document they were very eager to hide, but we got a hold of it anyway. We got this document. In the document, Mr. Cahill himself claimed a valuation of $20 million on the assets of Lifetech Global. This was shortly after the transfer. The only assets of Lifetech Global at that time was the machine that my colleague keeps talking about, but more importantly, the patents. If we look at the private placement memorandum, we see over and over talking about the patent rights. And the private placement memorandum, for example, is in volume 10 at, for example, 2333, 2332. All of these pages are talking about this valuable patent they have. And the valuable patent is derived from the provisional patents that were transferred from Lifetech, from PharmaPact. In fact, Mr. Cullen testified that Lifetech Global was a reformulation of PharmaPact. Those were his exact words. Is there any other evidence other than the private placement memorandum? You suggested Mr. Cahill is a sketchy character. You may be right. If that's the case, how much weight should we give to the fact that he claims in a private placement memorandum that it's worth $20 million? Well, if I may, at this point, the valuation, I think, was determined by the jury. Because the jury was told this valuation. Maybe they rejected it. In which case, they gave Mr. Edlock $250,000. But the constructive trust remedy, return of assets, is independent of valuation. In fact, what surprises me a little bit is my colleague keeps saying these assets were worthless. Well, if they're worthless, give them back. What do you care? On the one hand, they tell their investors the assets are worth $20 million. On the other hand, they tell this court, well, they're worthless. And they told the jury they're worthless. Well, if they're worthless, give them back. What do you care? Impose the constructive trust remedy. Give these worthless patents back that you say are expired. And everyone goes on their way. But at this point, in answer to your honor's question, I think we're past the question of valuation. The jury made a determination. They could have awarded a lot more money. They did not. So, you know, I would say that the assets are maybe not worth $20 million. But nonetheless, they should be returned. Excuse me. I'm sorry. I thought you said the jury's determination of $250,000 was based upon Mr. Edlock's investment. Correct. So where did the jury make any valuation of the value of either PharmaPAC or Lifetech's assets? Well, they were not asked to do that. Right. Now, I'm not expressing myself clearly. They were not asked to do that. They were asked to award Mr. Edlock his damages, and they did. And logically, they gave him his investment back more or less. I think it's off by $5,000. But we don't know, because the jury wasn't asked, what the jury's determination, if any, was about the value of PharmaPAC's assets or Lifetech. Correct. And I would say nor do we need to know, because a constructive trust remedy is independent of value. The assets should be returned. Now, in answer to Justice Simon's question, you know, it's interesting. In the case in chief, when Ms. Karpinski was asked, you know, what are your damages, she said, essentially, I'll leave it to the jury to decide. And was there anything in closing argument made about asking the jury for a specific award of actual damages from Ms. Karpinski? I think I can't find that in the transcript, but I think I made exactly the same argument to the jury in the first closing, not punitive, which is, we'll leave that for you to decide. We'll leave it for you to decide. So $10,000 is fully consistent with her request. Now, punitive, well, once she's awarded the damages, you know, punitive, she's asking for whatever. But she literally said, I'll leave it to the jury to decide. Fair enough. You know, this poor lady really had no business being dragged into federal court on this claim. This was a state court claim, but she had no choice because she sued for WECO and has to bring a cross-claim. All right. Thank you very much, counsel. We'll hear Mr. Markham's got a little bit of time here. We'll wait for Ms. Manning to punch in the clock. All right. Go ahead and unmute yourself. And you may proceed. Thank you very much. So Mr. Cagle was never a public trustee. Volume six of the excerpts of record, page 1109, he was in a private foundation. He was never a trustee. Even if he had been a trustee, that doesn't make you a public figure. And it doesn't make you a public figure. And whether public trustee or private foundation board member, he is not subject to the malice charge, the extra charge given in those circumstances, just because he was libeled mercilessly by Etelet and Karpinski. As we say in our brief, they were so destructive in their allegations against him. After he filed this lawsuit against him, they called him a sex assaulter. They called him a sex abuser, a sex harasser, worse than Barney Maynard. He hung out with mob lawyers because they're the only ones who would defend him. I don't defend mob lawyers for what that's worth, mob people for what that's worth, but that's what they said. That doesn't make him dragged into the public. All right. Judge Simon has a question. Even if he wasn't a public trustee, let's put that aside for a moment. Mr. Kashani says that from 10 ER 2337, it says that Mr. Cahill owns 50% of LifeTech Global. And I thought that was inconsistent with what you said earlier. It is. It absolutely is.  The transfer from PharmaPAC to LifeTech was in March of 2016, when it was owned by Cullen only. When it had nothing left except debts, patents that had been revealed. And the private placement memorandum was in February of 2017. After the assets had been taken over, Cullen then made arrangements to have some of the prior people come to work with him. And he gave some of the shares of stock to Cahill. But as of the time of the trial, it sounds like Cahill did own 50%. Yes, it did. With respect, I believe that the law is you value the transfer from the standpoint of its reasonableness at the time it's made, not later. And as of the time it's made, he wasn't an owner. Even if we value the value of the transfer at the time it's made, in terms of a constructive trust remedy, at the time of the trial, Cahill owns 50% of the transferee. True. But the constructive trust also, the case law says, that it is determined as of the time of the transfer. It's what's known then and who owns what then. Okay. And so even if you were to assume that somehow that was an unreasonable transfer, and I submit that the record shows that it was not, the fact is that when it was made and when those assets were received, they were clean in terms of EFT global holding, which is why the jury said there was no liability for EFT global. The judge said it, and the judge said it again. There was no wrongdoing. So when Cahill came in later, he doesn't buy what didn't exist at the time in terms of wrongdoing. The offering statement that Mr. Kashani relies upon is also his, as I said, in February of 2017. And at that point, they were aggressively soliciting more money, and they paid the money per share by saying, we believe that the projected value in 2017 is $20 million. That's not when the transfer was made. And thank you for your time, and unless there are more questions, we submit. My colleague went over. Could I have a minute to respond to that last statement? With respect, he went two minutes over. Yeah, I was going to say, I think we can wrap this one up. Thank you both for your argument in briefing this case. This matter is submitted, and this panel is in recess. We will convene again later this week. Thank you, everybody. Thank you. This court for this session stands adjourned.
judges: Owens, Simon, Lee